UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

STANFORD SHARP,

      Plaintiff,

v.

                                    Case No. 22-cv-11247
                                    Honorable Linda V. Parker

WILLIAMS PRODUCTS, INC.,

      Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This action arises from Plaintiff Stanford Sharp's employment with Defendant Williams Products, Inc. ("WPI"). Mr. Sharp alleges that he was subjected to a hostile work environment based on race and sex during his employment in violation of 42 U.S.C. § 1981 and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA").[1] The matter is presently before the Court on WPI's

---

[1] Mr. Sharp's Complaint, filed June 7, 2022, refers to discrimination based on his "national origin and/or heritage" (*see, e.g.*, ECF No. 1 at PageID. 4, ¶¶ 22, 23.) The allegations and the parties' subsequent briefing reflect that he instead is alleging discrimination based on race and gender. The Complaint also speaks of discrimination in the form of unequal treatment. (*See id.* at PageID. 4, 6, ¶¶ 23, 30.) Yet, the allegations in the Complaint do not describe adverse actions against Mr. Sharp, which were not taken against similarly-situated individuals outside the alleged protected classes. WPI seeks summary judgment with respect to Mr. Sharp's discrimination claim, arguing that he cannot establish an adverse action or that he was treated less favorably than similarly situated employees outside the

motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). (ECF No. 17.) The motion has been fully briefed. (ECF Nos. 18, 19.) Finding the facts and legal arguments adequately presented in the parties' briefs, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).

I.  **Summary Judgment Standard**

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*,

---

protected classes. (*See* ECF No. 17 at PageID. 92, 114-16.) In his response brief, Mr. Sharp fails to respond to WPI's arguments for dismissal of this claim. (*See generally* ECF No. 18.) Therefore, the Court finds the claim abandoned. *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases).

477 U.S. at 248).  The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor.  *Liberty Lobby*, 477 U.S. at 255.

**II.     Factual Background**

WPI is a manufacturing company in Troy, Michigan.  In March 2019, a temporary employment agency placed Mr. Sharp at WPI to work as a general laborer/construction fabricator.  (ECF No. 17-4 at PageID. 180, 181.)  Mr. Sharp is African-American.  After Mr. Sharp's 90-day probationary period, WPI hired him to continue with the company.  (*Id.* at PageID. 181.)

WPI's Operations Manager, Kyle Celmo, hired and supervised Mr. Sharp and the other shop employees.  (ECF No. 17-2 at PageID. 126.)  Mr. Celmo reports directly to the owner of WPI, who is currently Mark Williams but was Emiddio Zarro prior to March 2021.  (17-3 at PageID. 145-46.)  Mr. Williams works at home or while traveling, is not involved in the daily operations or management of WPI, and visits the shop in Troy on average only three times a month.  (ECF No. 17-2 at PageID. 123-24.)  Daily operations and management are left to Mr. Celmo.  (*Id.* at PageID. 124.)

Shop employee and supervisor Frank Slicker trained Mr. Sharp.  (ECF No. 17-4 at PageID. 192, 194; ECF No. 17-3 at PageID. 148-49.)  Mr. Sharp and Mr. Slicker worked in close proximity to one another, and usually on the same machine

3

on the shop floor.  (ECF No. 17-4 at PageID. 200.)  Mr. Slicker's employment with WPI ended in November 2020, however, after he was caught tampering with the time clock to give himself additional working hours.  (ECF No. 17-3 at PageID. 150; ECF No. 17-5 at PageID. 206.)

      Mr. Sharp claims that he was harassed by Mr. Slicker during the period they worked together.  Mr. Sharp provided that initially, "before it became racist and sexual," Mr. Slicker referred to him as a "crackhead" on three occasions when Mr. Sharp made mistakes, randomly threatened to fire Mr. Sharp, and told Mr. Sharp he should find another job because WPI was going out of business.  (ECF No. 17-4 at PageID. 192.)  Mr. Sharp reported the incident to Mr. Celmo, indicating that Mr. Slicker's comments made him uncomfortable.  (*Id.* at PageID. 192-93.)

      Mr. Celmo told Mr. Sharp he would handle it, but also that Mr. Slicker could not fire Mr. Sharp, the business was not going under, and that Mr. Sharp was needed at WPI.  (*Id.*)  Mr. Sharp maintains that Mr. Slicker's comments were never addressed, and three weeks to a month later, Mr. Slicker began to harass him based on his race.  (*Id.* at PageID. 194.)

      The first racial comments were made while Mr. Slicker was training Mr. Sharp on WPI's color-coded system.  (*Id.*)  Mr. Slicker explained to Mr. Sharp: "This is our backer rod system.  The soft type is yellow, the standard score is

green, you black, the hot rod is red.  You know, like you're black." (*Id.*)  Mr. Sharp reported the incident to Mr. Celmo, who said again that he would handle it.  (*Id.*)

A month or two later, when Mr. Sharp tried to get Mr. Slicker's attention to show him something, Mr. Slicker turned toward Mr. Sharp, holding and shaking his crotch area, and said, "I'll show you whatever you want to see.  Just don't ask me no gay shit." (*Id.*)  Mr. Sharp reported this incident to Mr. Celmo, as well, who said that there is no place for such actions at WPI, and that he would take care of it and talk to Mr. Slicker.  (*Id.*)  Mr. Sharp testified that he did not know if Mr. Celmo spoke to Mr. Slicker about these two incidents.  (*Id.*)

The next harassing behavior described by Mr. Sharp occurred while he and Mr. Slicker were working on a project together.  (*Id.* at PageID. 195.)  After listening to a news report about a former black professional basketball player's transgender son, Mr. Slicker said to Mr. Sharp:  "I didn't know that you big, bad blacks could be faggots.  Wow, I'm so shocked that you big black is faggots."[2] (*Id.*)  Mr. Sharp continued to work until the job was done, and then he reported what Mr. Slicker said to Mr. Celmo.  (*Id.*)  Mr. Sharp told Mr. Celmo that Mr.

---

[2] In his response brief, Mr. Sharp asserts that Mr. Slicker had said the same thing on a previous occasion.  (ECF No. 18 at PageID. 263-64 (citing ECF No. 17-4 at PageID. 194-95).)  However, this does not appear in the cited pages of Mr. Sharp's deposition or in the rest of his testimony.  Instead, the record reflects that Mr. Slicker just repeated the same or similar comment twice.  (*See* ECF No. 17-4 at PageID. 195; ECF No. 17-8 at PageID. 234.)

5

Slicker's comments made him feel very disrespected, crushed, and uncomfortable. (*Id.*) After Mr. Celmo indicated he would take care of it, Mr. Slicker went back to work with Mr. Slicker. (*Id.*)

Mr. Sharp also conveyed that Mr. Slicker asked him how he got the name "Stanford," remarking that it was a "prestigious name." (*Id.*) Mr. Slicker also asked Mr. Sharp if "[his] people tan" and indicated he was "only asking because you're black." (*Id.*) Mr. Sharp reported Mr. Slicker's comments to Mr. Celmo, who responded that there is no place at WPI for that type of conversation or communication, and he would handle it. (*Id.*)

Mr. Slicker asked Mr. Sharp other questions "because [he's] black," such as questions about Oprah Winfrey and Kid Rock. (*Id.*) Mr. Sharp told Mr. Celmo that, "throughout the day," Mr. Slicker was "just coming to [him] asking [him] questions about black people and black this." (*Id.*) Mr. Sharp told Mr. Celmo it was "uncomfortable." (*Id.*) Mr. Celmo again said that he would handle it. (*Id.*)

Mr. Sharp testified that he eventually stopped reporting Mr. Slicker's comments and, it "just became [Mr. Slicker's] way of treatment towards [him]." (*Id.*) When asked at his deposition what percentage of the time he was "harassed" by Mr. Slicker while they worked together, Mr. Sharp answered, "80 percent." (*Id.*)

6

During his deposition in this matter, Mr. Slicker indicated that he never "bec[a]me aware of any claims of race discrimination that [Mr. Sharp] spoke to [Mr. Celmo] about," and that Mr. Celmo had never spoken to him "about any concerns about discrimination that [Mr. Sharp] raised." (ECF No. 18-3 at PageID. 317.) Mr. Slicker also testified that he had never "come to learn that [Mr. Sharp] raised concerns about race discrimination about [him]." (*Id*.) When asked about some of the specific things Mr. Sharp accused Mr. Slicker of saying and/or doing,[3] Mr. Slicker testified that he did not speak or act like that, was unaware Mr. Sharp had raised a concern, and had never been accused of such behavior. (*Id*. at PageID. 317-18.

During his deposition, Mr. Celmo had no recollection of any conversation with Mr. Sharp about the comments discussed above; however, he did not deny that Mr. Sharp may have reported Mr. Slicker's comments and behavior to him. (ECF No. 17-3 at PageID. 159-60.) But Mr. Celmo also testified that he would have remembered if Mr. Sharp had said that Mr. Slicker was being racist or if racism had been discussed, and he thinks Mr. Sharp complained only of "abusive language or

---

[3] Mr. Sharp's counsel asked Mr. Slicker specifically only about the comments he made following the news report, the shaking-the-crotch incident, and asking Mr. Sharp questions "because he was black." (ECF No. 18-3 at PageID. 317-18.)

7

something along those lines."[4]  (*Id.* at PageID. 149.)  According to Mr. Celmo, he spoke with Mr. Slicker and told him everyone needed to get along and treat one another as they would want to be treated.  (*Id.*)

Mr. Celmo also could not recall receiving the written complaint that Mr. Sharp claims he provided to him in late 2021, which outlined the comments and conduct of Mr. Slicker and others.[5]  (*See id.* at PageID. 160; ECF No. 17-4 at PageID. 191, 195; ECF No. 17-9).  The incidents outlined in this writing include an event involving an independent contractor for WPI.  (*See* ECF No. 17-9.)

The independent contractor, Chris Minor, repaired WPI's waterjet and trained Mr. Sharp and other WPI employees on how to use the machine.  (ECF No. 17-3 at PageID. 156.)  Mr. Minor worked in the WPI shop for these purposes a few dozen times between early- to mid-June 2019 and November 2021.  (*See* ECF No.17-6.)  Mr. Minor also owned a furniture business, and he had received permission from WPI's former owner, Mr. Zarro, to have the materials for the

---

[4] For purposes of summary judgment, the Court construes the facts in a light most favorable to Mr. Sharp and assumes that he relayed Mr. Slicker's specific words and behavior to Mr. Celmo, as this is what Mr. Sharp's testimony reflects.

[5] Mr. Sharp testified that he provided a document to Mr. Celmo at the end of 2021, summarizing his previous verbal complaints, including the dates when the incidents occurred.  (ECF No. 17-4 at PageID. 191-92.)  When Mr. Sharp subsequently asked Mr. Celmo about the document, as Mr. Sharp did not make or receive a copy (*see id.*), Mr. Celmo could not find it (ECF No. 17-3 at PageID. 150).  Mr. Sharp therefore re-wrote the list at some unspecified time, which is the document in the record.  (*Id.*; *see also* ECF No. 17-9.).

8

business delivered to WPI.  (ECF No. 17-3 at PageID. 152.)  When Mr. Minor retrieved the materials from WPI about once a month, shop employees helped him load the materials onto his truck or trailer.  (*Id*.)

Sometime in July 2021, while Mr. Minor was working in the shop, he called to get Mr. Sharp's attention.  (ECF No. 17-4 at PageID. 196.)  When Mr. Sharp turned around, he found Mr. Minor with "a 3-feet piece of rubber swinging between his legs."  (*Id*.)  While swinging the material, Mr. Minor said, "I want to be like you guys.  I'm tired of the skinny white pussy I be getting.  I want to get some of that black shit that you've been getting."  (*Id*.)  Mr. Sharp turned back and continued his job.  (*Id*.)  He then went and told Mr. Celmo what happened.  (*Id*.)  Mr. Celmo said he would take care of it.  (*Id*.)

Two weeks later, Mr. Minor returned to WPI to pick up furniture materials which had been delivered.  (*Id*.)  While Mr. Sharp helped load the materials, Mr. Minor was cussing, saying to get his "shit on the truck" and "[h]urry up and put [his] shit on the truck, and get this shit handled."  (*Id*.)  When Mr. Celmo subsequently arrived at work, Mr. Sharp told Mr. Celmo he was very uncomfortable with Mr. Minor being allowed on the premises after what he previously said to Mr. Sharp.  (*Id*. at 196-97.)  Mr. Celmo said he was going to put a stop to Mr. Minor having his materials delivered to WPI and, if any material arrived, deny it.  (*Id*. at PageID. 197.)

Nevertheless, text messages between Mr. Celmo and Mr. Minor reflect that Mr. Minor continued to retrieve materials from WPI through mid-November 2021. (*See* ECF No. 18-5 at PageID. 412-15.) On November 16, however, Mr. Celmo sent the following text message to Mr. Minor:

> Hey man I've got some bad news.  While I was gone last week my boss was working and guys expressed a concern about the last time that you worked in our facility that you made some racial jokes.  Long story short I was told to let you know that you can't have your shipments sent here any longer and that I can't have you in the buildings at all.

(ECF No. 18-5 at PageID. 415.)  While Mr. Celmo suggested in a subsequent message that day that he might give Mr. Minor some work "behind the scenes" (*id.* at PageID. 416), there is no evidence that Mr. Celmo ever did so or that Mr. Minor did any further work for WPI.

Two additional comments were made to Mr. Sharp by a WPI employee, Jerry Watson, after this lawsuit was filed, which Mr. Sharp discusses in his response brief.  (*See* ECF No. 18 at PageID. 269-70.)  First, Mr. Watson told Mr. Sharp that a machine with tape and string around it looked "nigger rigged."  (ECF No. 17-4 at PageID. 186.)  Then, in response to Mr. Sharp saying that he wanted to go to the mountains in Colorado for his birthday, Mr. Watson stated that Mr. Sharp "would be a good mountain boy."  (*Id.*)  When Mr. Sharp told Mr. Watson that he was upset with the ongoing racism, Mr. Watson threw a trashcan.  (*Id.* at PageID. 185.)  While Mr. Sharp was telling Mr. Celmo about this incident, Mr. Watson

swore at them and then stormed out of the shop. (*Id*. at PageID. 186-87.) Mr. Celmo immediately terminated Mr. Watson's employment. (*Id*.)

At least as of the filing of the parties' summary judgment briefs, Mr. Sharp remained employed at WPI.

### III. Applicable Law & Analysis

Section 1981 and ELCRA claims are analyzed similarly to claims brought under Title VII of the Civil Rights Act of 1964. *Rogers v. Henry Ford Health Sys.*, 897 F.3d 764, 771 (6th Cir. 2018) (citations omitted); *In re Rodriguez*, 487 F.3d 1001, 1008 n.2 (6th Cir. 2007) (explaining that the ELCRA resembles federal law, and the same evidentiary burdens prevail as in Title VII cases). Thus, to succeed on a hostile work environment claim based on race or sex under § 1981 or the ELCRA, a plaintiff must show:

> (1) []he belonged to a protected group, (2) []he was subjected to unwelcome harassment, (3) the harassment was based on race [or sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citing *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999)); *see also Nathan v. Great Lakes Water Auth.*, 992 F.3d 557, 565 (6th Cir. 2021) (citations omitted). As will be discussed further below, there are varying ways of

proving the third requirement, and a claim under the ELCRA has an added element.

WPI claims that it is entitled to summary judgment because Mr. Sharp cannot establish that he was subjected to severe or pervasive harassment based on race or sex, and because WPI took remedial action in response to any report of harassment by Mr. Sharp.

A. "Because of" Race or Sex

A plaintiff may prove that the harassment was "based on" race or sex by showing either: "(1) direct evidence of the use of race-specific [or sex-specific] and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races [or sexes] in a mixed-race [or mixed-sex] workplace." *Williams*, 643 F.3d at 511 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998)) (approving these methods in the analogous context of sexual harassment). "Harassment is based on race [or sex] when it would not have occurred but for the plaintiff's race [or sex]; the harassing conduct need not be overtly racist [or sexist] to qualify." *Id.* (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007)). A plaintiff alleging a hostile work environment claim based on sex under the ELCRA must demonstrate the elements listed above and show that the conduct or communication was sexual in nature (not simply based on anti-female animus). *Kalich v. AT&T Mobility, LLC*, 679 F.3d

12

464, 471-72 (6th Cir. 2012) (citing *Haynie v. Michigan*, 664 N.W.2d 129, 133-35 (Mich. 2003)).

Mr. Sharp provides proof of race-based harassment. Some of the comments made to Mr. Sharp included race-specific and derogatory terms. Other comments were made to Mr. Sharp because of his race. In fact, Mr. Slicker often made clear that he was only asking Mr. Sharp certain questions because of Mr. Sharp's race.

The same cannot be said with respect to Mr. Sharp's claim of sex-based harassment. Only three of the instances described by Mr. Sharp were arguably "sex-based": (i) Mr. Slicker holding and shaking his crotch area and saying "don't ask me no gay shit"; (ii) Mr. Slicker's comments concerning his surprise that blacks might be gay or transgender; and (iii) Mr. Minor's comments while swinging a piece of rubber.[6] Nothing in the record suggests that these comments were made to Mr. Sharp because of his sex—although a reasonable juror certainly could conclude that at least two comments were directed at Mr. Sharp because of his race.[7] Further, for purposes of Mr. Sharp's ELCRA claim, at least the first and

---

[6] The Court finds the first and second comments to be based on gender-orientation rather than sex—a separate class for purposes of protection. However, the classification is not the determinative issue here.

[7] A jury perhaps might conclude that Mr. Minor would have made the comments only to a man and are, therefore "sex based." In other words, that he never would have said such comments to a woman. Nevertheless, because the comment was isolated, it would not support severe or pervasive sexual harassment.

second comments were not sexual in nature. The Court is therefore granting summary judgment to WPI on Mr. Sharp's claim of sex-based harassment.

### B. Severe or Pervasive

"Harassment is 'severe or pervasive' when it 'alters the conditions of the victim's employment and creates an abusive working environment.'" *Nathan*, 992 F.3d at 567-68 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)) (brackets omitted). The "severe or pervasive" requirement consists of two prongs, one subjective and the other objective. *Id*. at 568. As to the first, the plaintiff must have "subjectively perceive[d] the environment to be abusive[.]" *Harris*, 510 U.S. at 21. For the second, the question is whether the conduct is abusive "consider[ing] 'all the circumstances,' from the perspective of 'a reasonable person in the plaintiff's position[.]'" *Nathan*, 992 F.3d at 568 (quoting *Harris*, 510 U.S. at 23) (internal citation omitted). "A non-exhaustive list of the relevant circumstances includes the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23).

The record presents a jury question as to whether Mr. Sharp subjectively perceived the environment at WPI to be abusive. He testified that the complained-of conduct made him feel uncomfortable, unwelcome, and disrespected. He felt

14

unsafe at work. WPI's arguments for summary judgment focus on the second, objective prong.

As WPI points out, the Sixth Circuit "has established a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 482 (6th Cir. 2020) (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017)). "Occasional offensive utterances do not rise to the level required to create a hostile work environment because, to hold otherwise would risk changing Title VII into a code of workplace civility." *Id*. at 482-83 (cleaned up). "[E]ven offensive and bigoted conduct is insufficient to constitute a hostile work environment if it is neither pervasive nor severe enough to satisfy the claim's requirements." *Id*. (citations omitted).

A reasonable juror could find some of the comments made to Mr. Sharp to have been severe.[8] Moreover, contrary to WPI's assertion, Mr. Sharp presents

---

[8] WPI compares the comments in this case with those in other cases which the Sixth Circuit found not severe despite being "certainly insensitive, ignorant, and bigoted," *Williams*, 643 F.3d at 513, or "inappropriate and racially insensitive," *Woods v. Facility Source, LLC*, 640 F. App'x 478, 491 (6th Cir. 2016). This Court does not find the comments comparable, or at least believes a jury might disagree as to the severity of the statements involved here. Moreover, unlike *Woods*, there is no evidence that the comments made to Mr. Sharp were consistent with the workplace atmosphere at WPI. *See* 640 F. App'x at 491. And, unlike *Williams*, there is evidence the comments were not isolated. *See* 643 F.3d at 513. And the Court disagrees with WPI's assertion that "none of the comments referred to [Mr.

evidence from which a reasonable juror could conclude that he endured pervasive race-based comments during an eighteen month period while working with Mr. Slicker.  According to Mr. Sharp, Mr. Slicker's first race-based comments to him were made in May 2019.  Mr. Sharp testified that from that time until Mr. Slicker left WPI's employment in November 2020, race-based comments pervaded their interactions.  *See Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 252 (6th Cir. 1998) (focusing on the "plaintiff's assertion that [harassing comments] were commonplace, ongoing, and continual" in finding that a reasonable jury could conclude that harassment was severe and pervasive).

Mr. Sharp also testified that he was humiliated by the comments made by Mr. Slicker, Mr. Minor, and Mr. Watson.  A jury could agree that the statements would be demeaning to a reasonable person in Mr. Sharp's position.  Finally, Mr. Sharp need not show that his "tangible productivity . . . declined as a result of the harassment[,]" *Nathan*, 992 F.3d at 570 (quoting *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 567 (6th Cir. 1999)); instead, he "need only show that the

---

Sharp]'s race in a negative manner." (ECF No. 17 at PageID. 110.)  Such an assessment reflects, perhaps, a lack of understanding of racial stereotypes or how certain comments are perceived by individuals of a different race.  Moreover, comments that members of one class may view to be innocent or simple teasing due to a lack of awareness or because at one time in our history they were deemed acceptable does not mean that they are not severe insults from the perspective of the members of another class.  The objective prong does not just focus on how a "reasonable person" would perceive the conduct, but rather "a reasonable person *in the plaintiff's position*." *Nathan*, 992 F.3d at 568 (emphasis added).

harassment made it more difficult to do the job," *Williams*, 187 F.3d at 567 (citation omitted). As Mr. Sharp was required to work in very close proximity to a co-worker who, 80% of the almost two years they worked together, made race-based comments, a reasonable jury could find that those comments made it more difficult for Mr. Sharp to perform his job. The Court disagrees with WPI's assertion that Mr. Sharp's referral of his son to work for WPI "in the midst of alleged harassment . . . [c]ertainly . . . demonstrates that any conduct [Mr. Sharp] now asserts was harassing was not so egregious[.]" (ECF No. 17 at PageID. 112.) This is just one of many facts for the jury to consider when deciding whether the conduct was degrading.

### C. WPI's Knowledge & Response

An employer is liable for co-worker harassment "only 'if it knew or should have known of the charged [racial] harassment and failed to implement prompt and appropriate corrective action.'" *Doe v. City of Detroit*, 3 F.4th 294, 301 (6th Cir. 2021) (quoting *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 348 (6th Cir. 2005)). "To find liability, the employer's response . . . must 'manifest indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Id.* (quoting *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 338 (6th Cir. 2008)) (brackets omitted). "An employer's response is generally adequate 'if it is reasonably calculated to end the harassment.'" *Id.* (quoting *Hawkins*, 517 F.3d

17

at 340) (additional quotation marks and citation omitted). "The appropriate corrective response will vary according to the severity and persistence of the alleged harassment." *Id.* (quoting *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 633 (6th Cir. 2010)). "Steps that would establish a base level of reasonably appropriate corrective action may include promptly initiating an investigation, speaking with the specific individuals identified in the complaint, following up with the complainant, and reporting the harassment to others in management." *Id.* (cleaned up).

There is a genuine issue of material fact concerning WPI's knowledge of Mr. Slicker's and Mr. Minor's alleged race-based comments at or near the time they were made. While Mr. Celmo testified that Mr. Sharp only reported that Mr. Slicker's comments were "abusive," not racist, Mr. Sharp testified that he specifically reported most of Mr. Slicker's alleged race-based comments to Mr. Celmo immediately after they were made. Mr. Sharp testified that he told Mr. Celmo about Mr. Minor's conduct the day it happened. Mr. Celmo, in comparison, claims he only learned about it when Mr. Zarro brought it to his attention a day or two before Mr. Celmo told Mr. Minor he was no longer welcome at WPI.

There also is a genuine issue of material fact as to whether Mr. Celmo adequately responded to Mr. Sharp's complaints regarding Mr. Slicker's and Mr. Minor's behavior. On one hand, with respect to Mr. Slicker's behavior, Mr. Celmo

18

testified that he spoke with Mr. Slicker in response to Mr. Sharp's complaints. Mr. Sharp acknowledged during his deposition that he did not know what Mr. Celmo did to address his concerns. On the other hand, at his deposition, Mr. Slicker testified that, before this lawsuit, no one had ever spoken to him about Mr. Sharp's complaints. But even if Mr. Celmo discussed Mr. Sharp's complaints with Mr. Slicker, the continuation of the alleged race-based harassment could lead a jury to find that those discussions were not reasonably calculated to stop it.

The race-based conduct involving Mr. Minor occurred in July 2021. Mr. Sharp testified that he told Mr. Celmo about it immediately, and Mr. Celmo said he would handle it. There is no evidence that Mr. Celmo did anything to address Mr. Minor's behavior. Two weeks later, Mr. Minor was still coming to the shop to pick up his furniture materials, and Mr. Sharp had to help him load the materials, at which time Mr. Minor swore and was disrespectful to Mr. Sharp. Mr. Sharp again complained to Mr. Celmo, and Mr. Celmo promised to handle it and put a stop to Mr. Minor coming to the shop. However, it was not until mid-November—and apparently only because Mr. Zarro directed that he do so—that Mr. Celmo told Mr. Minor that he could not have his materials delivered to WPI or be in WPI's buildings.

Thus, a reasonable juror could find that WPI manifested indifference to, or failed to respond in a manner reasonably calculated to address, the race-based

19

harassment Mr. Sharp claimed he was enduring in the workplace. While Mr. Celmo did fire Mr. Watson immediately after Mr. Sharp complained about some of his behavior,[9] this does not necessarily negate WPI's failure to address the previous harassment Mr. Sharp experienced. Further, Mr. Sharp maintains that WPI's failure to address the previous harassment encouraged comments like Mr. Watson's to be made.

## IV. Conclusion

For these reasons, the Court holds that WPI is entitled to summary judgment with respect to Mr. Sharp's sex harassment claims under § 1981 and the ELCRA. A jury must decide whether Mr. Sharp was subjected to a hostile work environment based on race for which WPI is liable under those statutes.

Accordingly,

**IT IS ORDERED** that Defendant's motion for summary judgment (ECF No. 17) is **GRANTED IN PART AND DENIED IN PART**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: March 21, 2024

---

[9] It is not evident from the record whether Mr. Sharp reported Mr. Watson's "mountain boy" or "nigger-rigged" comments to Mr. Celmo, or only that Mr. Watson had thrown a trashcan. (*See* ECF No. 17-4 at PageID. 186-87.)